## Easton, Appellant, v. Salisbury, Respondent.

1. A location of a New Madrid certificate upon land reserved from sale, and a patent issuing therefor while the land remains so reserved, are entirely void, not voidable.
2. Such a location therefore, when made upon land reserved from sale by reason of its being covered by a Spanish claim, does not become valid so soon as the bar against that claim becomes complete.
3. A confirmation of a Spanish claim by the act of July 4th, 1836, will prevail over a New Madrid location and a patent, dated May 28th, 1827, both made while the land located upon was reserved from sale, although the bar against that claim became complete May 26, 1829, and remained so until July 9th, 1832, the date of the revival of the reservation from sale of the claims confirmed by the act of July 4th, 1836.

### *Appeal from St. Louis Court of Common Pleas.*

This was an action in the nature of an action of ejectment, to recover possession of certain lots of ground, situate in what is called and known as Stoddard's Addition. Plaintiff, Easton, claimed title under a New Madrid location, made in the name of James Smith, upon which a patent, dated May 28th, 1827, had issued to the said Smith or his legal representatives. The defendant claimed title under a confirmation by act of Congress of July 4th, 1836, to the legal representatives of Mordecai Bell.

The cause was tried by the court sitting as a jury, upon the

Easton v. Salisbury.

following agreed statement of the facts : " On the 9th of July, 1811, there were confirmed to James Smith, by the commissioners for the adjustment of titles to land in the territory of Missouri, lots nine and ten (9 and 10), containing two arpens of land in the village of Little Prairie, New Madrid county, Missouri. Afterwards, these lots, while still owned by said Smith, were materially injured by earthquakes, and proof thereof was made before the recorder of land titles at St. Louis, on the 16th November, 1815; whereupon there was issued by said recorder to said James Smith a certificate of new location, (commonly called a New Madrid certificate,) numbered 159. On the 22d October, 1816, said Smith and wife conveyed to Rufus Easton the said two arpens in Little Prairie, and assigned to him the right to locate other lands under said certificate in lieu of the land so injured ; and also conveyed to said Easton the land that might be located by means of said certificate. On November 16th, 1816, Easton gave notice to the surveyor general of said territory of Missouri, of the location of said certificate on a tract of land · about two miles west of the city of St. Louis, and demanded a survey thereof. In March, 1818, a survey was made by the direction of the surveyor general, in pursuance of said selection, and was duly returned and approved by said surveyor general. Said survey is numbered 2491, and the land thereby designated embraces the land in controversy, and is within St. Louis township, in St. Louis county, Missouri. By virtue of the premises, Easton held said land claiming the same until 1826, when he conveyed the same to Wm. Russell. On the 20th May, 1827, the United States issued a patent on said location for said land to James Smith or his legal representatives. On the 19th January, 1839, said Wm. Russell assigned and conveyed all his interest in said land to J. G. Easton, who, on the 18th March, 1845, conveyed and assigned the same to plaintiff. Defendant is in possession of the land described in the petition, and the same is within the boundaries indicated by said survey and patent.

" On the 20th January, 1800, a concession was made by the Spanish lieutenant governor to one Mordecai Bell of 350 arpens of land, including the premises in controversy. The representatives of Mordecai Bell, on 29th June, 1808, presented the claim for said land, together with a descriptive plat of survey thereof, to the board of commissioners for the adjustment of land titles in the territory of Missouri. The documents showing said claim and the derivative title from Mordecai Bell were duly recorded in 1808, by the recorder of land titles for the territory of Missouri; and on the 4th July, 1836, the United States confirmed said claim, according to said plat of survey, to the legal representatives of M. Bell; a survey of said confirmation was made by authority of the United States in ——, and is numbered 3026; said survey embraces the land in dispute; and all the title of the confirmee, by the act of 1836, is in the defendant. The survey, number 2491, and also the patent, dated 28th May, 1827, are in due form of law; but defendant does not admit the authority of the officers of the United States to make the one or issue the other; nor that the same were made or issued under any law. It is admitted that the land in controversy is worth more than two thousand dollars; that if the court should be of opinion that the plaintiff is entitled to recover, it is agreed that the damages shall be fixed at one cent, and the monthly value of the premises at one dollar. Either party is at liberty to turn this case into a bill of exceptions, and thereon prosecute a writ of error or take an appeal to the Supreme Court of the state or of the United States. It is admitted that survey No. 3026 was made under the authority of the United States; but the plaintiff may dispute the power of the United States as regards both the confirmation of 1836 and the survey No. 3026. It is admitted that the plaintiff had, at the commencement of this suit, all the title that was vested in said James Smith or his representatives, by the New Madrid location and patent above mentioned."

The court gave judgment for the defendant, Salisbury, and plaintiff, Easton, appealed to this court.

*Geyer* and *Gibson*, for appellant.

I. The title under which the plaintiff claims was good against the government of the United States. (Stoddard v. Chambers, 2 How. 284; Mills v. Stoddard, 8 How. 364; Menard's heirs v. Massey, 8 How. 310; Delauriere v. Emerson, 15 How. 525.)

II. The plaintiff's title being good against the government, good against all the world, except Bell's representatives, became indefeasible by the barring of Bell's claim in 1829, and could not be affected by a subsequent resurrection of Bell's claim.

III. The cause at bar is distinguishable from the case of Mills v. Stoddard in this, that there Mills' title was not complete until after the revival of the reservation. He had a mere equity. The government might, for any reason, or no reason at all, withhold his patent. Peltier's patent was not issued until after the revival of the bar in 1832, and the court expressly decides that the act of 1836 related back beyond Peltier's patent, and the court held that in that case the confirmation to Bell's representatives was the better title; but here the title was complete before the passage of the act of 1832.

IV. The land was subject to be disposed of by the government during the existence of the bar, from 1829 to 1832, to any person, or in any manner, and was then open to entry or location by any person. (Mills v. Stoddard, 8 How. 364.) Yet had the plaintiff applied for a patent during the bar (and the Supreme Court say that a patent issuing then would have incontestably passed a good title), he would have been properly answered by the officers of the government that two patents could never issue by the government for the same land under the same title and to the same person, and that as his patent was good against the government, and undoubtedly passed any title the government might have, a second patent could add no strength to his claim.

V. The issuing of the patent, in the case at bar, was a lawful act. It passed the title of the United States as against all the

world, except Mordecai Bell's representatives. Had their title never been confirmed, or had their claim been purchased by the patentee, or in any manner extinguished, it would have clearly passed an indefeasible title to the land, and an extinguishment in the nature of a limitation in 1829 was as effectual as any other method of annulling Bell's claim.

VI. As the issuing of the patent was a legal act, and binding upon the United States, it was a *sale* of the land to J. Smith, or his representatives, and was within the saving clause of the act of 4th July, 1836. The words of the proviso are that, "if it should be found that any tract confirmed or any part thereof had been previously located by any other person or persons under any law of the United States, or had been surveyed or sold by the United States, that act should confer no title on such lands, in opposition to the rights acquired by such location or purchase."

VII. In this case, the plaintiff has a patent which is conclusive of the regularity of all previous steps in the title. This title, we contend, is available against every person whose title originated since it was issued, and we say that the title now set up by defendant did, in fact, originate since the emanation of the patent, for there was a time when, as to us, the defendant's claim was dead. The patent, in the interval between 1829 and 1832, was a location under a law of the United States. (Le Bois v. Brammel, 4 How. 456.)

*T. T. Gantt*, for respondent, cited Stoddard v. Chambers, 2 How. 284; Mills v. Stoddard, 8 How. 345; Bissell v. Penrose, 8 How. 341.

SCOTT, Judge, delivered the opinion of the court.

In a conflict of title between a New Madrid location and a confirmation under the act of July 4th, 1836, as an original question, the inclination of the judgment of this court is well known. But the cases of Stoddard v. Chambers, (2 How. 284,) Mills v. Stoddard, (8 How. 345,) and Bissell v. Pen-

rose, (8 How. 317,) in the Supreme Court of the United States, in our opinion, have settled this question. As the patent to the New Madrid claimant, in the cases of Stoddard v. Chambers, and Mills v. Stoddard, bore date at a period subsequent to the 9th July, 1832, the date of the act which revived the reservation of the claims confirmed by the act of 4th July, 1836, it is maintained that this case is distinguishable from them, inasmuch as the patent on the New Madrid certificate was dated May 28th, 1827; that the reservation of the Spanish concession expired on May 26th, 1829, and was not revived until July 3d, 1832; consequently, there was an interval during which the patent was valid against the United States, and being so, the same land could not be confirmed to another by any subsequent grant, by whatever authority it may have been made.

The error, in this argument, consists in the assumption that there was a period during which the patent on the New Madrid location was valid against the United States. During the interval to which reference has been made, a patent might lawfully have issued for the land confirmed by the act of 4th July, 1836, which would have prevailed against a confirmation by that act. But as the party had a patent during this interval, it is maintained that he could not obtain another; that it was unnecessary, and would have been an act of supererogation; that having a patent, it would be hard to deprive him of his rights, because he did not unnecessarily apply for and obtain another.

The ground on which we proceed may seem a technical one, but a departure from it would involve the violation of a principle which we do not feel ourselves at liberty to disregard. The cases to which reference has been made show that any location of the land, made by any officer of the government whilst it was reserved from sale, was purely void; not voidable but void. Now a void act, when done, is as though it had not been done. Consequently the patent dated the 28th May, 1827, was a nullity. It was a blank, and could confer no right whatever. The plaintiff, then, can stand on no better ground

than the defendant occupied in the case of Penrose v. Bissell. If the President of the United States should issue patents for lands where sale is not authorized by law, and afterwards those lands should be brought into market, on what principle could the patents, issued at a time when there was no authority for so doing, be held to be valid for passing title to the lands described in them?

Independently of these considerations, the opinion of the Supreme Court of the United States, in the case of Mills v. Stoddard, (8 How. 365,) shows that the argument was made that a New Madrid location, if made on lands reserved from sale by reason of the Spanish claim, became valid so soon as the bar was complete against that claim, and it was met with the answer that the consequence does not seem to follow. If, during the bar, no act was done by the government to confirm the New Madrid claim, nor by the claimant to perfect his title, a removal of the bar would not prejudice any newly acquired right.

We see no difference in principle between the certificate of location and the patent. If the prohibition implied by the reservation is sufficient to destroy the validity of the certificate, there is no reason why it should not be equally fatal to a patent. The patent may, it is true, cure irregularities in making an entry, but the objection of a want of authority renders void all executive or ministerial acts, without regard to their solemnity. (Polk's lessee v. Wendell, 9 Cranch, 88.) The reservation of the unconfirmed Spanish land claims was made by section 10 of the act of March 3d, 1811. That reservation continued in force, without interruption, until May 26th, 1829, when it expired. Now the patent on the New Madrid certificate issued on the 28th day of May, 1827, whilst the land which it covered was, by an act of congress, reserved from sale. The judgment will be affirmed, with the concurrence of the other judges.